THE MILWAUKEE & ST. PAUL RAILWAY COMPANY VS. THE CITY OF MILWAUKEE.

RAILROAD COMPANIES: *What property exempt from taxation.*

1. Chapter 173, Laws of 1860, declares that "the track, right of way, depot grounds and buildings, machine shops, rolling stock, and all other property, *necessarily used in operating any railroad* in this state, belonging to any railroad company, are hereby, all and singular, declared to be, and they shall henceforth remain, exempt from taxation for any purpose whatever," with a *proviso* excepting special assessments for local improvements within cities and incorporated villages, and a further *proviso*, "that all lands owned or claimed by such railroad companies not adjoining the track of such company, shall be subject to all taxes," etc. *Held,*

    (1) That in determining whether particular property of a railroad company is "*necessarily* used in operating" its road, so as to be exempt under the statute, the question is, whether its use is requisite for the full performance of the duty which the company *owes to the public as a common carrier.*

    (2) That the statute is to be fairly and liberally construed in favor of the railroad companies, which do not receive such exemptions as a *bonus*, but are required to pay into the state treasury an equivalent for taxes in the shape of a license. 29 Wis., 116.

    (3) That where property of a railroad company is *principally* used for a purpose *not necessary* for the proper operating of the road, it is not exempt from taxation. 29 Wis., 116.

2. *It seems* that, under the laws of this state, as a general rule, the exemption of railroad property from taxation is co-extensive with the right of the railroad company to take property by condemnation. So *held,* where the question related to the exemption of *real* property.

3. Railroad companies are not required to furnish storage for grain transported, after their connection with it as common carriers has ceased, nor can they, under existing laws, condemn property for the purpose of erecting "elevators" thereon; and such elevators, erected by the plaintiff company, with the land on which they are situated, are taxable for all purposes.

4. *Warehouses* and sheds belonging to plaintiff in Milwaukee, *principally* used for the storage of freight received from propellers and consigned to plaintiff for transportation, or of freight carried to Milwaukee by plaintiff's road and designed for shipment by propellers, were struc-

tures needed by plaintiff in the proper discharge of its *duties as a carrier*, and, with the land, adjoining plaintiff's road, on which they were situate, were *exempt from taxation*, notwithstanding they were to some extent in charge of agents of propeller lines, who stored in them some goods from propellers consigned to parties in Milwaukee, and in some cases charged storage thereon.

5. Lots adjoining plaintiff's track in Milwaukee, which seem to have been a part of its depot grounds in said city, but upon which one B. was permitted, from time to time, without charge, to pile salt, mainly for shipment over plaintiff's road, *held* also *exempt from taxation*.

6. Certain marsh lots and blocks in said city, originally acquired by plaintiff for depot grounds, but *never reclaimed or used* for that purpose, *held liable to taxation*.

7. All lots or parcels of land necessarily used by the company for its repair shops, or yards, or depot grounds, or for the preservation and protection of its road-bed, or for the purpose of obtaining gravel and earth therefrom for its road (the same being adjacent to the road), are *exempt from taxation;* but dwelling houses and the land occupied by them *are not so exempt*.

8. The purposes for which lands may be *condemned* by railroad companies, and held by them *exempt from taxation*, considered by LYON, J.

APPEAL from the County Court of *Milwaukee* County.

From 1860 to 1869 inclusive, a large number of blocks and lots in the city of Milwaukee, owned during all that time by the plaintiff or by certain other railroad corporations to whose franchises and property the plaintiff has succeeded, were assessed and taxed in each of said years for state, county, city, ward and school purposes.    For nonpayment of such taxes said blocks and lots were sold, each year, and the city holds all the certificates of such sales.    The purpose of this action was to procure the judgment of the court that such blocks and lots were, during all the time aforesaid, exempt by law from taxation, and that such certificates of sale be cancelled.

The county court held that a portion of said real estate was exempt from taxation, and as to such portion gave judgment for the plaintiff for the relief asked.    From this part of the judgment no appeal was taken.

The court further adjudged that a portion thereof was liable

to taxation for the purposes aforesaid, during such years. From this portion of the judgment, the plaintiff appealed.

The real estate so held liable to taxation may be conveniently classified as follows:

1. *Elevator property.* On the parcels of land included under this head there are situated four large grain elevators, with the usual appurtenances, used for the storing of grain which has been shipped to Milwaukee over the railroad of the plaintiff. It appears that these elevators, or some of them, were sometimes operated directly by the railroad company owning them, and sometimes by individuals under contracts with such company, by which the latter received a share of the proceeds of the business and reserved a certain control over it; that grain was stored in the elevators at certain fixed rates for storage, and remained there until the owner chose to remove it; that it is very convenient for the plaintiff to own and control these elevators, and its business is thereby greatly facilitated; and that the same ought to be operated in entire harmony with the railroad company. There is some conflict of testimony as to whether it is *necessary* to the successful operation of its railroad that the plaintiff should own the elevators. It appeared that some railway companies own and operate elevators, while others do not; and still others own them, but the same are operated, as in this case, by other parties under contracts with or leases from the companies.

2. *Warehouse property,* so called. These are certain buildings, sheds and structures used for the purpose of receiving freight from propellers, consigned over plaintiff's railroad, and freight which has been shipped over plaintiff's road to be delivered to propellers. The usual course of business in respect to these warehouses was as follows: The plaintiff permitted each agent of a propeller line to occupy one of the buildings, who took charge of the building and the freight deposited therein. He paid no rent for the building. He received there, from propellers, merchandise consigned to parties in Milwau-

kee, and sometimes collected storage charges on such merchandise, which he retained; but by far the largest portion of goods received into those warehouses passed over the railroad of the plaintiff. The agents of the propeller lines in charge of these structures were also, to a certain extent, the agents of the plaintiff. They receipted for and in behalf of the plaintiff, and in its name, for goods received from propellers to be shipped over the plaintiff's railroad. The foregoing arrangements respecting these warehouses, sheds and structures, seem to have been made and adopted by the plaintiff and its predecessors solely for its and their convenience and benefit, and were never matters of contract with such agents or propeller lines.

3. Certain lots, part and parcel of the depot grounds or yard of the plaintiff, and used as such, but upon which one Butler was permitted (without charge) to pile salt, the most of which was intended to be shipped over plaintiff's railroad.

4. Certain blocks and lots, purchased for depot purposes, but which have never been so used, the same being marsh lands and never having been reclaimed.

5. Other lots and parcels of land in different localities and variously situated and used. These do not require specific mention inasmuch as the rules are given in the opinion by which the question of the liability of each lot to taxation may be determined.

*John W. Cary*, for appellant:

1. The elevators are the property of the railroad company, are used in connection with its road, and are necessary to its successful operation. The lands upon which they stand are in the midst of its grounds, and all are occupied for track purposes. If in any manner subject to taxation, the true principle would seem to be, to hold the grounds exempt as part of the railroad, and allow the buildings to be taxed as personalty. 2. The lands designated as warehouse property are exempt under ch. 173, Laws of 1860, and ch. 130, Laws of 1868. Not only do they adjoin the track of the company, but they are crossed and

occupied by its tracks, and are, in fact, a part of the tracks, buildings and grounds of the company, within the meaning of the statute. The warehouses are all used for railroad purposes, and without them the road could not be successfully operated, nor its business profitably and successfully transacted. The occupation of such warehouses by the agents of the propeller lines greatly facilitates the business of both carriers, and affords no reason for denying the exemption of the property from taxation. Nor does it alter the case that storage is charged in some cases on freight consigned to Milwaukee and not designed for further transportation. The statute does not require that the property shall be *exclusively* used by the railroad company, but only that it be owned and *necessarily used* by the company in operating its road. The principal or main use of the property should control in determining this question. The storage of freight is part of the legitimate business of a railroad company, and the doctrine of the case of *The Mil. & St. Paul R'y Co. v. Supr's of Crawford Co.* (29 Wis., 116) does not apply. 3. Railroads pay an equivalent for taxes, and the statute of exemption should receive a liberal construction in their favor. Each company should be permitted to determine for itself the amount of land required for its right of way and depot grounds, and such determination, if within reasonable limits, should not be reviewed by the court, at least in an action of this character. *Burns v. M. & M. R'y Co.*, 9 Wis., 450; *Ford v. C. & N. W. R'y Co.*, 14 Wis., 609. Upon this principle, the lands used for storage of salt mainly for shipment, and the vacant marsh lots, originally purchased for depot grounds, but not yet reclaimed nor used by the company, would all be exempt.

*Emil Wallber*, City Attorney, for respondent, argued that the elevators were not necessary to the railroad company in its character of common carrier, but were erected for its convenience and profit simply, and for the purpose of increasing its business and earnings; that the warehouses were occupied by

agents of propeller lines, and were used for storing freight not designed for transportation over the railroad; that they partially served private interests, and could not be deemed property *necessarily used* in operating a railroad; and the fact that side tracks run in and through them could not change their legal status; that the same principle applied to the remaining lands, a portion of which was not used by the railroad company at all, while part were used by private parties for storing salt, iron, lumber, etc.; and that subd. 13 of sec. 2, ch. 130, Laws of 1868, under which plaintiff claimed exemption, had already been construed by this court in the case of *The M. & St. P. R'y Co. v. Supr's of Crawford Co.*, 29 Wis., 116, and under the rule there announced, the whole property in question must be held taxable.

LYON, J.    Chapter 173 of the Laws of 1860 provides as follows: "Section 1.    The track, right of way, depot grounds and buildings, machine shops, rolling stock, and all other property necessarily used in operating any railroad in this state, belonging to any railroad company, are hereby, all and singular, declared to be, and they shall henceforth remain exempt from taxation for any purpose whatever; and it shall not be lawful to assess or impose taxes upon any property before named: *Provided, however*, that all the property hereinbefore mentioned shall be subject to special assessments, for local improvements, within cities and incorporated villages: *And provided, also*, that all lands owned or claimed by such railroad companies, not adjoining the track of such company, shall be subject to all taxes, to the same extent as though this act had not been passed."

The enumeration in this statute of the kinds of property exempted from taxation is certainly sufficiently comprehensive to include the real estate described in the complaint.    The corporations to whose property and franchises the plaintiff has succeeded, and the plaintiff, were the owners thereof during the

years they were assessed and taxed, as charged in the complaint; and such real estate was, during those years, and still is, adjoining the track of the railroads of such corporations respectively, and of the plaintiff. Hence, if during that time it was necessarily used in operating such railroads, it was, when so used, exempt from taxation.

We have no concern on this appeal, with the parcels or lots which the county court held were thus exempt, but only with those which were held to have been liable to taxation. The question to be determined is, therefore, whether the property which the county court held liable to taxation, or any portion of it, was necessarily used in operating the railroads of the plaintiff or its predecessors, during the aforesaid years.

It must be admitted that all, or nearly all, of such property was used in connection with the business of the plaintiff and the other corporations above mentioned, and, in one sense, was used in operating their railroads. Conceding, for the purposes of the case, that it was used in operating such railroads, we come directly to the question, Was it *necessarily* so used?

To answer the question correctly, it becomes necessary to determine the sense in which the word "*necessarily*" is used in the statute. The term has no fixed, absolute significance, but is, to some extent, a relative one. There are different degrees of necessity. A thing is necessary in the highest degree, when it is inevitable — when it must be. In a lesser degree that is necessary which cannot be otherwise without preventing the purpose intended; that which is indispensable, requisite or essential. Webster's Dic. The term, therefore, signifies something more than mere convenience, and may signify something less than that which is inevitable. In the case of *Mil. & St. Paul R'y Co. v. The Board of Supervisors of Crawford Co.*, 29 Wis., 116, it was held that the law exempting certain railroad property from taxation should receive a fair and liberal construction in favor of the railroad companies, for the reason that such exemption is not a *bonus* or donation to the corporations,

as it is in some of the states, but on the contrary they pay into the state treasury an equivalent for taxes in the form of license money. Construing and interpreting the statute by the above rule, we must hold that the lesser degree of necessity before mentioned is intended, and hence, the property in question was exempt from taxation if it was requisite or essential to the operating of such railroads.

In the case above cited (*Railway Co. v. Supervisors, etc.*), we had occasion to construe this exemption law, and we there held that a building which was used *principally* as a hotel, and was kept in the manner hotels are usually kept, for the accommodation and entertainment of all persons, whether travellers upon the railway or not, together with the outbuildings and inclosures necessary to a hotel, and the land covered thereby and included therein, were not exempt from taxation under this law, although the hotel was adjacent to the railroad track, and was owned and controlled by the company, and portions of it were used as a station house or depot for the accommodation of travelers on the railroad of the company. The decision was put upon the ground that it is not usual or necessary for railway companies to carry on a general hotel business, and hence that the property was not *necessarily* used in operating the railroad, within the meaning and intent of the statute. That case also decides that if the property is *principally* used for a purpose not necessary to the operating of the railroad, and if, to a small extent only, it be *necessarily* used in operating the road, it is not within the exemption of the statute.

In looking through the adjudged cases on this subject, we find the rule laid down, that the exemption of railroad property from taxation is co-extensive with the right of the railroad company to take land for its use by condemnation; and that the limit of such right is the limit of the exemption. *State, N. J. R. R. & Trans. Co. v. Hancock,* 33 N. J. Law R., 315. This rule seems reasonable and just, and it may furnish a more certain test by which to determine, in any given case, whether

specific railroad property is or is not exempt from taxation. For these reasons we are strongly inclined to adopt it as a correct rule.

It is indisputable that the legislature has power to confer on a railway corporation the right of eminent domain only in those cases in which the property is sought to be condemned to some use of a public nature, that is to say, for some purpose pertaining to the obligations of the company to the public. And it is not to be presumed that the legislature has attempted or will attempt, to confer that right, except in cases where its exercise is a public necessity.

It is not proposed here to define the limits of legislative power in this behalf. It is sufficient for our present purpose to say that we do not find in the charters of the railroad companies to whose franchises the plaintiff has succeeded, or in the amendments thereto, any indication that the legislature intended to confer upon those companies this high prerogative of sovereignty any further than was necessary to enable them to fulfill those obligations which are strictly public in their character.

The original charter of The Milwaukee & Waukesha Railroad Company, approved February 11, 1847 (Laws of 1847, p. 194), as amended by ch. 49, Laws of 1850, conferred upon that company and upon its successor, The Milwaukee & Mississippi Railroad Company, the right to take, by condemnation, a strip of land four rods wide for its railroad, and adjacent lands beyond the four rods, "when necessary for the purpose of erecting depot buildings, station houses, and necessary fixtures for the operation of the business of said road, * * * and to obtain earth, gravel and other materials for embankments and structures necessary to the construction and repairs of said road." (Sec. 2.)

The charter of The La Crosse & Milwaukee Railroad Company (Laws of 1852, ch. 198), as amended by ch. 280, P. & L. Laws of 1856, confers upon that company the same power to

take for its railroad a strip of land one hundred feet wide, and other lands beyond the limits of the one hundred feet, which its chief engineer shall, in the manner therein prescribed, " cer tify and declare to be necessary for the use of said company for the purpose of erecting depot buildings, station houses, freight houses, warehouses, engine houses, machine shops, or for buildings or fixtures of any kind, or grounds about the same, for the convenient operation of the business of the road, * * * or for the purpose of obtaining earth, gravel, stone or other materials for embankments, structures or superstructures, necessary to, or for the construction, repair or renewal of said road." (Sec. 1, Act of 1856.) The power here granted is very ample, but the existence of a *necessity* for taking property for the use of the corporation is distinctly made a condition pre cedent to such right of condemnation, however objectionable may be the mode prescribed by the law for determining that such necessity exists.

The principle upon which the state will permit the right of eminent domain to be exercised, is indicated by sec. 2, art. XI of the constitution : " No municipal corporation shall take pri vate property for public use against the consent of the owner, without the necessity thereof being first established by the ver dict of a jury." Of course, the manner of condemnation there prescribed is not applicable to those cases where the right is conferred by law upon other than municipal corporations ; but in the charters of the various corporations to whose franchises the plaintiff has succeeded, we find no grant of the right to take private property by condemnation, except where such taking is *necessary* to enable the corporations to perform their obligations to the public.

Furthermore, it is a question worthy of careful consideration, whether, under the general railroad law (Laws of 1872, ch. 119), a person cited to show cause why his land should not be con demned to the use of a railway company, may not defeat the condemnation by showing that the land proposed to be taken

is not necessary to the company for any public use.   (See sec. 15.)   We do not here determine this question.

It should be further observed, that, had the rule that the right of exemption from taxation is coextensive with and limited by the right to take property by condemnation, been applied in the case of *The Mil. & St. Paul R'y Co. v. The Board of Supervisors of Crawford County*, and had the case been determined solely upon the application of that rule, the decision would have been the same.   And in the present case, the application of that rule alone, or of the rule hereinbefore stated for the construction of the exemption law, will lead to the same results.

Having thus determined the general principles of law applicable to the case, it only remains to ascertain therefrom whether the specific lots and parcels of land which the county court held liable to taxation during the years aforesaid, were so liable.

1. While it is doubtless competent for the plaintiff to own and operate elevators for the purpose of receiving and ,storing therein, for hire, for longer or shorter periods of time, grain shipped over its road, and while its business interests and convenience may be thereby greatly advanced and promoted, yet the plaintiff is under no public obligation to furnish storage for such grain, or any other merchandise, after the owners or consignees have had a reasonable time to remove the same. The public obligations of the plaintiff are those which pertain to its functions as a common carrier, and not as a mere warehouseman.   The plaintiff may, after a reasonable time. has elapsed to remove merchandise shipped over its road, store the same in any suitable warehouse, and thereby relieve itself from any further liability on account thereof; or it may store the same in its own warehouse or elevator.   If it pursues the latter course, it is thereby relieved from the strict liability of a common carrier in respect to such merchandise, and thereafter will only be liable as a warehouseman.

The business of providing warehouses and storing therein,

for hire, grain which is in transit from the farms of the producers to a market, is a separate and distinct business largely carried on by parties who are not common carriers. It is essentially a private business, and imposes upon those engaged in it no *public* obligations whatever. In this respect it is on the same footing with any other merely personal or private pursuit, and is entirely unlike the business of a common or public carrier, upon whom the law imposes important public obligations. It is a business which no legislature or court has yet, to our knowledge, required a common carrier to prosecute. Although it may be and doubtless is intimately connected with that of a carrier, yet it is not necessarily a branch of the latter business. Each may be carried on separately from the other. The carrier transports the goods to their destination and delivers them to the warehouseman, and his connection with and responsibility for the goods there ends, and the responsibility of the warehouseman therefor commences at the same point.

The proposition that the business of the warehouseman is separate and distinct from that of the carrier who brings to the former merchandise for storage, is recognized in the general railroad law of 1872, wherein the rights of private owners of elevators, warehouses and mills at stations on any railroad, are, to some extent, protected. (See sec. 47.)

The grain which is shipped by plaintiff's railroad to Milwaukee, and which is to remain in store there, may as well be delivered into warehouses owned and operated by other parties as into those owned and operated by the plaintiff; and it is fair to presume that were the plaintiff not engaged so extensively in the warehouse business in that city, private capital and enterprise would furnish all necessary facilities for handling and storing all of the grain shipped to that place. It is no doubt true that entire harmony and concert of action between the carrier and warehouseman are important. These are important in a thousand other business relations of a purely

private character. But we think that the law of self-interest may safely be trusted to produce these results.

The relation of the warehouse business, as conducted by the plaintiff in Milwaukee, to its functions as a common carrier, is the same in principle as the relation of the hotel business in Prairie du Chien to such functions. In each case, the business is a convenience to the plaintiff, and promotes its business interests; but in neither case does the law require the plaintiff to engage therein.

If the foregoing views are correct, it seems clear that the plaintiff cannot take property by condemnation for the purpose of erecting elevators upon it, for the storage therein, for hire, of grain shipped over the plaintiff's railroad, after its liability as a common carrier, in respect to such grain, has ceased; or, at least, that it cannot do so under existing laws.

It seems impracticable to separate the land from the structure thereon, for the purposes of taxation, and to hold that one is taxable, and the other is not; and no good reason is perceived for doing so. If the structure is taxable, it seems to us that the land upon which it is erected must be taxable also. Land and structure together constitute the realty, and are necessarily used together for the common purpose.

Our conclusion is, that the elevator property in question was not necessarily used in operating the railroad of the plaintiff, and hence, that the same was not exempt from taxation during the years the same was assessed and taxed, as stated in the complaint.

2. The warehouses (so called) and sheds into which freight was received from propellers and consigned over plaintiff's road, and from the railroad, to be shipped by propellers, may more properly be designated as freight depots or freight houses.

It is the duty of the plaintiff (as it was of its predecessors) to furnish all necessary structures in which to receive freight for shipment over its lines, and into which to unload freight from its cars for delivery to the owner, consignee or connecting car-

rier.   This is a public obligation imposed upon it as a common carrier, and it can doubtless take land by condemnation for the purpose of erecting such structures thereupon.   Such is and was the character of the structures in question.   It is of no importance that they were, to some extent, in charge of the agents of the propeller lines, who stored in them some goods received from propellers and consigned to parties in Milwaukee, and in some cases collected storage charges thereon.   Notwithstanding these facts, the structures were used *principally* for a purpose necessary to the operation of the railroad.   We have seen that in such case it is quite immaterial that the structures were also used, exceptionally, for other and private purposes.

In our opinion, these warehouses and sheds, and the land which they occupy, should not have been held liable to taxation.

3.  The lots in block 148, upon which one Butler was permitted from time to time to pile salt for shipment over the plaintiff's railroad, come within the principle applied to the warehouses and sheds.   Besides, they seem to be a portion of the depot grounds of the plaintiff in actual use, and to have been so used for many years.   These lots must be held to have been exempt from taxation during the years in which they were assessed and taxed, from 1860 to 1869 inclusive.

4.  The several blocks and lots which, although originally acquired for depot grounds or yards, are in a marsh, and have never been reclaimed or used for that purpose, were correctly held liable to taxation.   The statute only exempts such property as is necessarily *used* in operating the railroad, and certainly the parcels now under consideration are not and never have been so used.

It appears, however, that a portion of such blocks and lots have been taken for canal purposes.   If the title to any portion of such lands has passed out of the plaintiff, of course for such portion it should not be taxed after it ceased to be the owner thereof.

5. We do not deem it our duty on this appeal to pass specifically upon the question of the taxability of each particular lot or parcel of land. We leave that to the county court, after laying down the rules which we think should govern that court in the discharge of that duty.

It is only necessary to' add that all lots or parcels of land necessarily used by the company for its repair shops or yards, or depot grounds, or for the preservation and protection of its road bed, or for the purpose of obtaining gravel and earth therefrom for its road (the same being adjacent to the railroad of the .plaintiff), are also exempt from taxation; but dwelling houses, and the land occupied by them, are not so exempt.

*By the Court.*— The judgment of the county court is reversed, and the cause remanded with directions to that court to render judgment in accordance with this opinion.